IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SHERRY DEAN HUDSON,                    )
                                       )
                Plaintiff,             )
                                       )
        v.                             )        Case No.
                                       )        11-3356-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner        )
of Social Security,                    )
                                       )
                Defendant.             )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sherry Hudson seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's low back pain was not a severe impairment, (2) in failing to assess a proper residual functional capacity, (3) in failing to give controlling weight to plaintiff's treating physician, Ricky Casey, D.O., and in failing to specify that any weight was given to plaintiff's treating cardiologist, David Zuehlke, M.D., and (4) in improperly discrediting plaintiff's testimony. I find that the substantial evidence in the record supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.     BACKGROUND

On April 23, 2008, plaintiff applied for disability benefits alleging that she had been disabled since December 31, 2006. Plaintiff's disability stems from diabetes, asthma, digestion problems, back problems and heart problems. Plaintiff's application was denied on June 27, 2008. On April 8, 2010, a hearing was held before Administrative Law Judge Edmund Werre. On July 26, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the

Act. On July 26, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 2 of 44

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

>    Yes = not disabled.
>    No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>    No = not disabled.
>    Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

>    Yes = disabled.
>    No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

>    No = not disabled.
>    Yes =  go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Steve Benjamin, in addition to documentary evidence admitted at the hearing.

## A. SUMMARY OF TESTIMONY

During the April 8, 2010, hearing, plaintiff testified; and Steve Benjamin, a vocational expert, testified at the request of the ALJ.

## 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 46 years of age and is currently 48 (Tr. at 24). Plaintiff lives in El Dorado Springs, Missouri, in a one-story house with no basement (Tr. at 23-24). She has lived alone since about a year before the administrative hearing, or in the spring of 2009 (Tr. at 24). Plaintiff is 5'2" tall and weighs 253 pounds (Tr. at 26).

Plaintiff has a high school education and a CNA certificate (Tr. at 24). Plaintiff is currently working for her brother (Charles Tigner) as a home-health aide -- she washes his dishes, cooks his meals, makes sure he takes his medication (Tr. at 24, 26-27). She works two and a half hours a day, five days a week (Tr. at 25). She earns $184 every two weeks (Tr. at 25). Plaintiff is able to sit in a recliner sometimes when she works (Tr. at 31). Plaintiff said she had been helping Mr. Tigner for about 40 years, although that would have made her six years old when she began that job (Tr. at 25). She used to work more than 12 or 13 hours a week but she decreased her hours about six years earlier (Tr. at 25). Mr. Tigner's wife takes care of him when plaintiff is not there (Tr. at 40). He lives about ten minutes away from plaintiff (Tr. at 40).

4

Although she alleges disability since 2006, she worked for a man named Marlin Powers until approximately 2008 (Tr. at 40). She worked two hours and fifteen minutes per day seven days a week (Tr. at 41). Mr. Powers lived with plaintiff at the time (Tr. at 41). She would take care of Mr. Powers and then go to her brother's to take care of him (Tr. at 41).

Plaintiff also took care of her aunt, Brenda Rogers (Tr. at 41). That could have been in 2008 but plaintiff does not remember (Tr. at 41). Ms. Rogers lived about two minutes from plaintiff's house (Tr. at 41). She does not remember how many hours per week she spent caring for Ms. Rogers (Tr. at 41-42). Although plaintiff indicated on her disability application paperwork that she worked for her brother, she did not disclose that she worked for Mr. Powers or Ms. Rogers (Tr. at 42). The money she received for caring for those people was paid by Medicaid (Tr. at 42).

Plaintiff cannot work full time because her "health won't let" her (Tr. at 25). She has lower back pain, asthma, and heart trouble (Tr. at 27). She has suffered with back pain for years (Tr. at 27). Plaintiff's primary care doctor treats her for back pain (Tr. at 27-28). He has not recommended surgery (Tr. at 28). When her back pain first occurred, she went to a chiropractor but was told that popping her back was not going to do any good (Tr. at 28). She had a series of three shots in her back but it did not do any good because the problem is the nerves, which is what Dr. Casey and a back specialist told plaintiff (Tr. at 32-33). Heat and ice both make her back pain worse (Tr. at 33). She takes hydrocodone for her back, and that makes her sleepy (Tr. at 28). Plaintiff's doctor wants her to lie down every two hours for 20 minutes (Tr. at 29). Dr. Casey told her to do this about a month before the hearing (Tr. at 44). She can sit in a recliner for an hour (Tr. at 29-30). If she is in a straight-back chair with her feet on the floor, she would have to get up after 30 minutes and walk around for 20 to 30 minutes (Tr. at 29, 30). Driving, walking and bending aggravate her back pain (Tr. at 31).

Plaintiff suffers from asthma which makes it hard to walk too much (Tr. at 33). She also has allergies which make it hard for her to breathe (Tr. at 33). Cold air bothers her asthma; hot weather bothers her asthma (Tr. at 33). Dust and bleach cause her eyes to water, she sneezes, and it is difficult to breathe (Tr. at 33-34). Plaintiff used a rescue inhaler when she could afford it (Tr. at 34). She continues to smoke (Tr. at 34). A pack will last her about 2 1/2 days (Tr. at 34). She used to smoke a pack a day (Tr. at 34). She cut back about two months before the administrative hearing (Tr. at 34). She has been smoking since she was 17 (Tr. at 34). She is trying to quit (Tr. at 34).

Plaintiff gets headaches almost every day (Tr. at 34-35). She used to take amitriptyline at night which prevented her headaches, but she can no longer afford that medication (Tr. at 35). Despite testifying that when she was taking amitriptyline she did not get headaches, plaintiff was asked how many headaches she would get when she was taking amitriptyline and she said, "one or two a week" and they would last "usually all day" (Tr. at 35). Even with a headache, plaintiff would go to her brother's to work (Tr. at 35-36). Then the rest of the day she would lie in bed in the dark (Tr. at 36). Now that she is not taking amitriptyline, she gets headaches almost every day (Tr. at 36). She lies down in bed in order to alleviate her headache pain (Tr. at 36).

Plaintiff had a number of heart catheterizations and had a stent inserted (Tr. at 36). Lately she had been having chest pain and shortness of breath on exertion (Tr. at 36). When asked what kinds of things cause shortness of breath, plaintiff said, "I don't really -- pains in my back." (Tr. at 36). If she bends over, she gets short of breath (Tr. at 36). Walking does not cause shortness of breath, and neither does heat (Tr. at 37).

Plaintiff is diabetic and began taking insulin about a month before the hearing (Tr. at 37). She monitors her blood sugar four times a day (Tr. at 37). On average her blood sugar

6

has been in the 200s (Tr. at 37). When plaintiff was asked whether her doctor recommended any kind of special diet because of her diabetes, she said, "He just upped the one blood sugar pill because I, I had to lose one of my blood sugar pills because I couldn't afford them, and so he just upped the, like the Metformin from 500 to 1000 twice a day." (Tr. at 38). The ALJ asked her again whether her doctor had recommended a special diet, and she said he had not (Tr. at 39-40). She acknowledged that her doctor had recommended she quit smoking, and that is why she is trying (Tr. at 40). She was diagnosed with diabetes five years before the hearing, or in 2005 (Tr. at 40).

Plaintiff can stand for 15 to 20 minutes at a time (Tr. at 30). Dr. Casey has restricted plaintiff to lifting a maximum of five pounds (Tr. at 31). Plaintiff does no lifting in her part-time job (Tr. at 31).

Plaintiff has a valid driver's license and drove to the hearing (Tr. at 25). The trip took an hour and a half, and plaintiff had to stop once due to back pain (Tr. at 26, 27). Plaintiff would have stopped more, but she was running late (Tr. at 27). After having made that drive, plaintiff was "hurting really bad" (Tr. at 27).

Plaintiff takes pain medication and lies down to relieve her back pain (Tr. at 31). If plaintiff is at home she spends about five or six hours a day lying in bed (Tr. at 31-32). When plaintiff gets home from work, she lies down and takes a pain pill because she cannot take the pain pill at work (Tr. at 32).

Most of the time plaintiff's mother comes over and does the shopping and cleaning (Tr. at 38). This is because "there's days that I can't because I'm hurting so bad I can't move" but despite that, plaintiff goes to work on those days (Tr. at 38). Plaintiff's mother has to come over to help her about four days a week (Tr. at 39). Plaintiff's mother dusts, vacuums, cleans

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 7 of 44

the house and makes food for plaintiff (Tr. at 39). Plaintiff's mother has never worked, but she receives some kind of financial benefit from her husband passing away (Tr. at 39).

On the day of the hearing plaintiff did not take any medication because she cannot drive when she is taking pain pills and she does not take her other medications until around 11:00 (Tr. at 43-44).

## 2. Vocational expert testimony.

Vocational expert Steve Benjamin testified at the request of the Administrative Law Judge. The first hypothetical involved a person limited to light work defined as the ability to lift up to 20 pounds occasionally and ten pounds frequently; stand and walk six hours each day; sit six hours each day; alternating sitting and standing every 30 minutes; no exposure to temperature or humidity extremes, irritants such as gases, fumes, or chemicals; and no climbing ropes ladders, or scaffolds (Tr. at 45). The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 45). The person could work as a marker, D.O.T. 209.587-034, with 28,830 positions in Missouri and 1,873,390 in the country; an assembler, D.O.T. 729.687-010, with 4,670 in Missouri and 215,230 in the country; a food and beverage order clerk, D.O.T. 29.567-014, which is a sedentary position with 7,130 in Missouri and 248,030 in the country; or polisher, D.O.T. 713.684-038, also a sedentary position, with 1,470 in Missouri and 91,990 in the country (Tr. at 45-46).

The second hypothetical was the same as the first except the person could lift up to ten pounds and stand and walk for two hours per day (Tr. at 46). The vocational expert testified that such a person could perform the jobs of food and beverage order clerk or polisher (Tr. at 46).

The third hypothetical was the same as the second except the person would need frequent unscheduled breaks throughout the work day (Tr. at 46). The vocational expert

testified that if the rest breaks were more frequent than every two hours or if they were unscheduled, then the person could not work (Tr. at 46).

## B.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Application for Social Security Disability Benefits

In plaintiff's application dated April 23, 2008, she listed Marlin Powers as her current employer from whom she earned $545.58 monthly (Tr. at 97).  "I do not receive any other type of income." (Tr. at 97).  Plaintiff was living with Marlin Powers at the time (Tr. at 96).

### Earnings Record

The record establishes that plaintiff earned the following income from 1983 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1983 | $ 986.58 | 1997 | $ 2,478.83 |
| 1984 | 0.00 | 1998 | 956.96 |
| 1985 | 48.21 | 1999 | 2,392.50 |
| 1986 | 0.00 | 2000 | 7,399.62 |
| 1987 | 765.74 | 2001 | 348.70 |
| 1988 | 2,905.04 | 2002 | 13,635.00 |
| 1989 | 9,326.32 | 2003 | 13,500.00 |
| 1990 | 4,275.74 | 2004 | 13,170.00 |
| 1991 | 2,237.45 | 2005 | 12,420.00 |
| 1992 | 160.61 | 2006 | 16,769.06 |
| 1993 | 3,148.92 | 2007 | 7,918.56 |
| 1994 | 2,324.63 | 2008 | 7,813.44 |
| 1995 | 3,792.89 | 2009 | 4,890.00 |
| 1996 | 2,780.07 | | |

(Tr. at 116, 145).

Plaintiff's earnings did not amount to substantial gainful activity during any year except 1989, 2002, 2003, 2004, 2005 and 2006.[1]  The record does not include the income source for

---

[1]http://www.ssa.gov/oact/cola/sga.html

9

1989, but the record shows that plaintiff's income during 2002 through 2006 came from Medicaid. She took care of the following individuals during those years:

2002 - Marlin Powers

2003 - Marlin Powers

2004 - Marlin Powers

2005 - Marlin Powers, Danny Rodgers

2006 - Marlin Powers, Danny Rodgers, Margaret Dean

(Tr. at 111).

During 2007 plaintiff's income came from Medicaid for taking care of Charles Tigner, Timothy Rodgers, Elizabeth Jennings and Marlin Powers; although her income did not reach the substantial gainful activity level (Tr. at 112). During 2008 plaintiff's income came from Medicaid for taking care of Brenda Rodgers, Marlin Powers, Timothy Rodgers, and Charles Tigner, but did not reach the substantial gainful activity level (Tr. at 118). During 2009 plaintiff's income came from Medicaid for taking care of Charles Tigner and Marlin Powers but was not substantial gainful activity (Tr. at 118).

**Federal Tax Returns**

At the request of the ALJ plaintiff submitted her federal tax returns for 2007, 2008 and 2009 (Tr. at 145-149). Only the 1040A forms were submitted, there were no supporting documents submitted. Plaintiff's returns show that she claimed James Smith (other) and Kristopher Rodgers (nephew) as dependents in 2009 (Tr. at 145). She claimed Elizabeth Ingerson (daughter) and Kimberlee Rodgers (sister) as dependents in 2008 and in 2007 (Tr. at 147-148). According to the Internal Revenue Code, in order to claim a person as a dependent under the qualifying child rules, the child must live with the taxpayer for more than half the

year. Under the qualifying relative rules, the taxpayer must provide more than half of the dependent's total support.

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated May 23, 2008, plaintiff reported that she lives at home by herself, that she cares for children, that she can do laundry, do dishes, make beds, change sheets, iron, vacuum, sweep, take out the trash, go to the post office, and shop (Tr. at 169-176). On an average day, she cleans her house and cooks her meals. She is able to watch a 30-minute television show but falls asleep. She is able to drive an unfamiliar route and she takes trips.

**C.     SUMMARY OF MEDICAL RECORDS**

Throughout 2006, plaintiff occasionally saw primary care physician Rick Casey, D.O., and physician's assistant Joyce Heuser, PA-C, at St. John's Clinic in El Dorado Springs, Missouri, for a variety of acute impairments, including cough, fever, headache, bronchitis, and chest discomfort (Tr. at 284). Plaintiff complained of high blood sugar, but acknowledged that she had not been taking prescribed diabetes medication (Tr. at 284). Dr. Casey and Ms. Heuser provided medications and recommended plaintiff stop smoking (Tr. at 284).

Plaintiff also visited the Cedar County Hospital emergency room in El Dorado Springs, Missouri, in February and early December 2006 for issues unrelated to her allegedly disabling impairments, including a small laceration and skin lesions (Tr. at 197-203, 204-211, 490-496). A nurse noted that plaintiff was diabetic, but was not taking any prescribed medications, claiming she was unable to afford them (Tr. at 198, 488). Plaintiff indicated on hospital admission forms that she was employed as a caregiver (Tr. at 197, 204).

On December 29, 2006, two days before her alleged onset of disability, plaintiff saw Ms. Heuser, complaining of uncontrolled diabetes, abdominal discomfort, chest pain, and leg

11

weakness (Tr. at 283-284). She asked to "restart meds" for diabetes, claiming she had not taken medication for several months due to the expense but that she had recently gotten her Medicaid back. She also requested an angiogram[2] in light of a family history of heart disease. Ms. Heuser recommended exercise and dietary changes, refilled plaintiff's diabetes medications, and provided hydrocodone (narcotic).

On January 10, 2007, plaintiff complained to Ms. Heuser of a perineal rash and uncontrolled blood sugars, again reporting that she had not taken medications for several months because she could not afford them (Tr. at 283). Ms. Heuser told plaintiff to take her current medications, use a cream on her rash, and follow up in two weeks. She scheduled a stress echocardiogram[3] ("ECG") and electrocardiogram[4] ("EKG") in response to plaintiff's complaints of leg weakness with exertion. Laboratory testing at Cedar County Memorial Hospital showed high glucose (280, with normal being under 105) and HbA1c,[5] but was otherwise normal (Tr. at 212).

---

[2]An angiogram is an X-ray test that uses a special dye and camera (fluoroscopy) to take pictures of the blood flow in an artery (such as the aorta) or a vein (such as the vena cava).

[3]An echocardiogram is a test that uses sound waves to create a moving picture of the heart.

[4]An electrocardiogram records the heart's electrical activity.

[5]A hemoglobin A1c (HbA1c) test is used to monitor long-term glucose (sugar) control in people with diabetes . While daily blood sugar testing gives a picture of day-to-day fluctuations, the hemoglobin A1c test offers an overview of how well glucose has been controlled over the past two to three months. The test assesses the amount of glycated (sugar-coated) hemoglobin in the blood. Hemoglobin is the oxygen-carrying protein found in red blood cells. Protein and sugar naturally stick together, and there is more sugar in the blood of people with poorly controlled diabetes, so they tend to have a higher percentage of HbA1c in their blood. Because the sugar stays attached to hemoglobin for the life of the red blood cell (about 120 days) doctors can use the test to determine the person's average blood sugar levels over that time. Plaintiff's HbA1c was 12.1 indicating an average blood sugar level of over 350, or a "dangerously elevated level."

12

On January 23, 2007, plaintiff saw Dr. Casey at the St. John's Clinic complaining of chronic low back pain (Tr. at 282). He noted "low pain tolerance and minor depression associated with their [sic] chronic condition." Upon examination, Dr. Casey observed some lumbar spasm and decreased range of motion. He prescribed hydrocodone (narcotic) and told plaintiff to return in three months. "I don't see any evidence of drug seeking from their [sic] behavior but if situation warrants would consider help form [sic] psychology or ultimately pain center consultation. . . . Physical therapy considered and due to chronicity of problems and financial consideration, home therapy with strengthening and mobility exercises were encouraged."

On February 1, 2007, plaintiff had a stress ECG and EKG at Cedar County Memorial Hospital (Tr. at 213, 293, 487). Cardiologist David Zuehlke, M.D., noted the ECG and baseline EKG were unremarkable, with no evidence of pain or echographic change.

In February and March 2007, plaintiff saw Dr. Casey several times and went to the emergency room once for issues unrelated to her alleged disability (Tr. at 215-216, 220-221, 277, 279-281, 482-486).

On March 9, 2007, plaintiff report elevated blood sugars and insomnia to Dr. Casey (Tr. at 278-279). Dr. Casey also discussed elevated cholesterol. He prescribed Trazodone (for insomnia), Mevacor (lowers cholesterol), and an increased dosage of insulin (for diabetes), and told plaintiff to return in three months.

On March 18, 2007, plaintiff was seen at the emergency room for pain in her right shoulder (Tr. at 215-217). She was listed as unemployed and had Medicaid as her insurer. She weighed 214 pounds and was smoking one pack of cigarettes per day. She had shoulder pain with range of motion. She was given Flexeril, a muscle relaxer, and was discharged.

13

On April 4, 2007, plaintiff went to the St. John's Clinic, complaining of cough and wheezing, headaches, skin lesions, and low back pain (Tr. at 276). A doctor noted some wheezing and cough, but a physical examination was otherwise unremarkable. He prescribed Macrobid (antibiotic) and Medrol (steroid to reduce inflammation).

On April 13, 2007, plaintiff saw Dr. Casey at the St. John's clinic with complaints of cough, congestion, chest pain, and low fever (Tr. at 275). Dr. Casey diagnosed acute bronchitis and chest pain with a negative stress test, prescribed Robitussin (for cough), and referred plaintiff for a cardiology consultation.

Four days later, on April 17, 2007, plaintiff saw Dr. Casey again, complaining of pain (Tr. at 273). Dr. Casey discussed the possibility of ulcers or gastroparesis,[6] prescribed hydrocodone (narcotic), provided samples of Prilosec (reduces stomach acid), and referred plaintiff to her cardiologist, Dr. Zuehlke.

Plaintiff returned to Dr. Casey on April 26, 2007, complaining of hypoglycemia (her blood sugar was 40) (Tr. at 272). Dr. Casey noted acute hypoglycemia (low blood sugar), cough secondary to chronic lung disease and smoker syndrome, and chronic general anxiety disorder. He prescribed Tessalon for cough and Librium for generalized anxiety.

On May 3, 2007, plaintiff saw Dr. Zuehlke at the Freeman Heart & Vascular Institute complaining of chest pain that lasted up to five minutes at a time, alleviated somewhat by aspirin (Tr. at 339-341). Plaintiff reported she had no history of any other illnesses. Dr. Zuehlke noted multiple risk factors and thought plaintiff "may very well have coronary artery disease."

_____

[6]Gastroparesis is a condition that reduces the ability of the stomach to empty its contents, but there is no blockage (obstruction). Diabetes can cause gastroparesis.

14

On May 10, 2007, Dr. Zuehlke performed a catheterization, which showed stenosis (narrowing) in the left anterior descending artery (Tr. at 337-338). Dr. Zuehlke "successfully angioplastied and stented" plaintiff, provided aspirin and Plavix (prevents blood clots), and asked plaintiff to return in two weeks.

On May 15, 2007, plaintiff saw Dr. Casey, complaining of sore throat and general petechiae[7] after her recent stent placement (Tr. at 271). Dr. Casey prescribed Amoxil (antibiotic) and Medrol (steroid to reduce inflammation).

On May 22, 2007, plaintiff returned to Dr. Casey, complaining of continued chest pain (Tr. at 270). Dr. Casey told plaintiff to consult with Dr. Zuehlke.

On May 27, 2007, plaintiff went to the emergency room at Cedar County Hospital complaining of chest pain (Tr. at 224-229, 235, 474-479). Plaintiff later said she was not really having chest pain but was just experiencing pressure from her recent stent placement. Treatment notes indicated probable costochondritis (chest wall pain) and resolved chest pain. Dr. Casey prescribed Norco (narcotic) and ordered additional testing.

On June 7, 2007, plaintiff returned to Dr. Zuehlke, complaining of chest pain (Tr. at 336). Dr. Zuehlke doubted the pain was cardiac in nature, but ordered a stress study "to be sure."

On June 20, 2007, plaintiff saw Dr. Casey, complaining of pain and pressure with urination (Tr. at 269). Plaintiff reported that her blood sugar was "doing well" even though she had skipped her medication. A physical examination was unremarkable. Dr. Casey continued plaintiff on her medications and instructed her to monitor her blood sugars.

---

[7]A small red or purple spot on the body caused by a minor hemorrage (broken capillary blood vessels).

On June 21, 2007, plaintiff complained to Dr. Zuehlke of chest pain with exertion (Tr. at 335). Dr. Zuehlke thought a cardiac problem was unlikely, but noted that plaintiff's stress test showed some possible ischemia[8] and felt "obligated" to look at her arteries.

Four days later, on June 25, 2007, Dr. Zuehlke performed a left heart catheterization[9] and ventriculography[10] (Tr. at 296, 334). The ventriculogram was normal, showing minimal plaque, minimal obstruction, normal hemodynamics, and no significant restenosis (recurrence of narrowing).

On June 29, 2007, plaintiff went to the Cedar County Hospital emergency room complaining of cough and sore throat (Tr. at 236-237, 469-473). Plaintiff was diagnosed with pharyngitis (strep throat) and given Amoxicillin (antibiotic) (Tr. at 238, 240-242, 472).

On July 13, 2007, plaintiff was seen at Dr. Casey's office for refills of diabetes medication and also complaining of bug bites (Tr. at 266, 268). Dr. Casey diagnosed cellulitis (skin infection) and prescribed Bactroban (antibacterial ointment).

On July 18, 2007, plaintiff saw Dr. Zuehlke, reporting occasional stress-related chest pain but no other difficulties (Tr. at 333). Dr. Zuehlke noted that the recent catheterization was normal and showed no reason for pain. He suspected that whatever plaintiff had was "getting better" and would "go away by itself" and told plaintiff to return in six months.

---

[8]A decrease in the blood supply to a bodily organ, tissue or part caused by constriction or obstruction of the blood vessels.

[9]Cardiac catheterization involves passing a thin flexible tube (catheter) into the right or left side of the heart, usually from the groin or the arm. With this procedure, the doctor can collect blood samples from the heart, measure pressure and blood vlow in the heart's chambers, examine the arteries of the heart, etc.

[10]Radiography of the ventricle of the heart after injection of a contrast medium.

16

On August 14, 2007, plaintiff was seen at Dr. Casey's office complaining of headaches, left leg pain, and digestive problems (Tr. at 266-267). Plaintiff also asked for a refill of her "nerve pill." Dr. Casey noted that plaintiff was "doing fine" and was stable on her current pain medications, and "Psych OK." X-rays of plaintiff's lower left leg were unremarkable (Tr. at 243, 292, 468). He continued plaintiff's hydrocodone (narcotic), Celexa (antidepressant) and Librium (for generalized anxiety) and told her to return in three months.

On Saturday, October 27, 2007, plaintiff was seen at the Cedar County Hospital emergency room reporting that she was hearing voices and seeing people (Tr. at 244-248, 463-467). Plaintiff said she was under a lot of stress due to money issues (Tr. at 245, 464). Plaintiff weighed 230 pounds and reported smoking two packs of cigarettes per day. She was observed to be in no acute distress, and her physical examination was normal. She was given Ativan for anxiety and was told not to take her Librium. Plaintiff was given four days' worth of Ativan and told to see Dr. Casey on Monday.

On November 2, 2007, plaintiff saw Dr. Casey for a routine diabetes checkup and reported schizoid episodes of hearing voices (Tr. at 265). Dr. Casey talked to plaintiff about fatigue. He noted that plaintiff's diabetes was stable. He talked to her about diet, exercise, and taking her medications as prescribed. He assessed schizoid episodes of hearing voices and fatigue. He refilled her medications, told her to return in six months, and suggested she consider psychiatric counseling.

Five days later, on November 7, 2007, plaintiff returned to Dr. Casey's office and saw Joyce Heuser, a physician's assistant, complaining of cough and congestion not relieved by over-the-counter medications (Tr. at 264). Plaintiff had some wheezing but was otherwise normal and able to walk without difficulty. Plaintiff also reported continued "'episodes' of loss of touch with environment - states she's aware of family talking to her and working around

17

her, but she can't respond appropriately". The episodes last several seconds and occur mostly in the evening and during times of increased stress. According to plaintiff, her blood sugar had been running normal. A doctor prescribed antibiotics and cough medication. "Supportive cares reviewed".

On November 15, 2007, Dr. Casey provided refills of Citalopram (also known as Celexa, an antidepressant) and hydrocodone (narcotic) (Tr. at 262).

On December 14, 2007, Dr. Casey provided refills of Metformin (for diabetes) and other medications (Tr. at 262).

On January 1, 2008, plaintiff was seen in the emergency room for left thumb pain (Tr. at 254-257). She reported smoking three to four packs of cigarettes per day. Her x-ray was normal (Tr. at 260). She was given Norco (narcotic) and assessed with tendonitis (inflammation of the tendons) of the left wrist.

On January 8, 2008, plaintiff underwent magnetic resonance imaging (MRI) of the brain at the Nevada Regional Medical Center due to complaints of headaches, motor sensory changes, and loss of consciousness (Tr. at 291, 414). The study showed a small nodule in the frontal horn of the left lateral ventricle, felt to represent a normal choroid plexus collection rather than a true intraventricular mass, and was otherwise normal.

On January 15, 2008, plaintiff saw Dr. Casey, complaining of sore throat pain not relieved by Tylenol (Tr. at 263). Dr. Casey diagnosed strep throat and provided Keflex (antibiotic), Lorcet (narcotic), and Librium (for anxiety).

On January 20, 2008, plaintiff returned to the Cedar County Hospital emergency room complaining of mild right thumb pain (Tr. at 253-259, 461-462). Plaintiff was diagnosed with tendonitis, prescribed Norco (narcotic), and told to use ice and follow up with Dr. Casey.

18

On March 24, 2008, plaintiff saw neurologist Ling Li, M.D., at the St. John's Clinic in Springfield, MO, complaining of stress-induced headaches for the past three to four years (Tr. at 195-196, 349-350). "Occasionally she will have a migraine type of headache or she needs to lie down, and she throws up. A migraine type of headache is not frequent. Her pressure headaches average from 5-6 [in severity]. Three to four times a week it could be 8-10. She has been taking hydrocodone (narcotic) for headache and back pain. Reported that hydrocodone did not touch her headache. She drinks caffeine on a daily basis. Did not notice any other obvious triggers. Does report that she has quite a bit of stress." Plaintiff reported frequent episodes of hearing and knowing what is going on but feeling unable to respond. The episodes "last a very short period of time". Plaintiff reported smoking a half a pack of cigarettes per day. Dr. Li noted that plaintiff was in no acute distress; her coordination and gait were normal, her physical and mental status exams were normal. She assessed tension headaches and occasional migraine headache. "I discussed with her at length regarding lifestyle changes. I asked her to keep a headache diary, regular exercise and cut down her caffeine intake." She prescribed amitriptyline (antidepressant) as a prophylaxis (preventative medicine).

On April 1, 2008, plaintiff returned to Dr. Zuehlke complaining of radiating chest pain that occurred twice a week for five to ten minutes (Tr. at 332). Dr. Zuehlke recommended a heart catheterization.

On April 4, 2008, plaintiff saw Dr. Casey, complaining of thumb pain, back pain, and diabetes (Tr. at 261, 413). Dr. Casey noted that plaintiff's diabetes was stable, but she had some lumbar spasm and decreased range of motion in her back. He prescribed hydrocodone (narcotic) for six months.

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 19 of 44

On April 7, 2008, Dr. Zuehlke performed a left heart catheterization in response to plaintiff's complaints of episodic chest pain (Tr. at 294-295, 331). The study was normal, with no high grade obstruction and only minimal irregularity in the arteries.

On May 12, 2008, plaintiff was seen at Dr. Casey's office complaining of a sore throat and ear ache (Tr. at 412). Dr. Casey prescribed Cephalex (antibiotic).

On June 26, 2008, Lester Bland, Psy.D., a State agency physician, completed a psychiatric review technique form finding that plaintiff had no severe mental impairment (Tr. at 318-326). Based on his review of the evidence of record, he found that plaintiff had no restrictions in activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

On July 25, 2008, plaintiff told Dr. Li she was "headache free" most of the time, but had several episodes of falling after a cough (Tr. at 348). Dr. Li diagnosed tension headaches, "doing much be[tter] on amitriptyline," and scheduled an MRI.

On July 26, 2008, plaintiff returned to Ms. Heuser, complaining of urinary pain and cough, but noting that her diabetes was doing "really good" (Tr. at 409-410).

On September 30 2008, plaintiff saw Dr. Casey about her back pain and generalized anxiety disorder (Tr. at 404, 410). Dr. Casey noted that plaintiff was "doing well" on her current medications and was "able to function." Upon examination, he observed that plaintiff's lungs were "very clear," her heart was "regular," her orientation was "normal," she had "no extremity problems," and she ambulated without difficulty.

On October 2, 2008, plaintiff told Dr. Li she was "doing quite well" with respect to headaches, other than some recent headaches due to lack of sleep (Tr. at 347). A repeat MRI was stable.

Dr. Li observed that plaintiff had no weakness, normal sensory signs, and normal gait (Tr. at 347). She continued plaintiff's medication and told her to return in six months.

On November 4, 2008, plaintiff complained to Dr. Zuehlke of chest discomfort (Tr. at 330). Dr. Zuehlke thought plaintiff's chest pain was atypical and recommended further testing to "see if there is any reason" to do another angiogram.

On November 18, 2008, plaintiff underwent a stress EKG at Cedar County Memorial Hospital; the results were normal (Tr. at 456).

On December 28, 2008, plaintiff went to the Cedar County Memorial Hospital emergency room with complaints of tailbone pain after falling on a ramp the day before (Tr. at 450-455). X-rays were normal. Plaintiff was given Norco (narcotic) for pain.

On January 5, 2009, plaintiff saw Dr. Casey with complaints of cough and pain (Tr. at 400-401). Dr. Casey had a "long discussion" with plaintiff about anxiety and pain, which were "stable on current meds."

On February 6, 2009, plaintiff presented to Ms. Heuser complaining of cough, headache, and abdominal pain with constipation and bloating, and she requested a gastroenterology (GI) consultation (Tr. at 396-397). Plaintiff reported that her blood sugar was well controlled. Ms. Heuser observed that plaintiff's musculoskeletal system and range of motion were normal, she diagnosed bronchitis and abdominal pain, she prescribed Amoxicillin (antibiotic) and Medrol (steroid to reduce inflammation), and she referred plaintiff for a GI consultation.

On February 13, 2009, plaintiff returned to Ms. Heuser, complaining of persistent cough, but reporting that she had not yet taken the prescribed steroid medication (Tr. at 392-393). Upon physical examination, Ms. Heuser noted that plaintiff's range of motion was

21

normal. She diagnosed cough, told plaintiff to quit smoking, and ordered chest x-rays, which were unremarkable (Tr. at 393, 449).

On March 31, 2009, plaintiff saw Dr. Casey with complaints of cough, chest discomfort, and sinus drainage (Tr. at 386). Dr. Casey noted lumbar spasms were present and she had decreased range of motion in her lumbar spine. He diagnosed diabetes mellitus II "controlled with no complications" and acute bronchitis, and he ordered back x-rays. X-rays of plaintiff's spine taken on April 22, 2009, showed no fractures, well-maintained bodies and interspaces, and some degenerative change, but no acute osseous (bone tissue) abnormality (Tr. at 448).

On April 30, 2009, plaintiff asked Dr. Casey for an MRI referral for her back and refills of medications (Tr. at 381-382). Upon examination, Dr. Casey noted that plaintiff had lumbar spasm and decreased range of motion in her lumbar spine. He ordered an MRI of plaintiff's lumbar spine and a venous Doppler ultrasound of plaintiff's right leg. Doppler imaging studies of plaintiff's right leg in May 2009 were normal (Tr. at 446-447).

On May 13, 2009, plaintiff saw Ms. Heuser with complaints unrelated to her alleged disabling impairments (Tr. at 376-378).    On June 5, 2009, plaintiff saw Dr. Casey complaining of a cough and sinus drainage (Tr. at 373-374). Dr. Casey diagnosed acute bronchitis and prescribed Amoxicillin (antibiotic).

Less than three weeks later, on June 26, 2009, plaintiff saw Dr. Casey about a cough and earache, requesting refills of hydrocodone (narcoic) (Tr. at 369-370). Dr. Casey prescribed Bactrim (antibiotic).

On July 15, 2009, plaintiff saw Ms. Heuser complaining of intermittent knee and leg pain, not helped by pain medication, and "lots of home stressors" (Tr. at 364-365). Ms. Heuser noted that plaintiff was "morbid obese appearing." Her musculoskeletal exam was

22

normal with normal range of motion and no tenderness. Her psychiatric exam was normal with normal mood and affect and normal behavior. X-rays of plaintiff's left knee showed mild joint fluid, but no fracture or bony abnormality (Tr. at 444). Ms. Heuser diagnosed knee pain and uncontrolled diabetes, recommended Naprosyn (anti-inflammatory), and told plaintiff to rest and elevate and ice her knee.

The following week, on July 23, 2009, plaintiff saw Dr. Casey about her left knee (Tr. at 360). Dr. Casey noted significant effusion (fluid) and bruising, but x-rays were normal. Otherwise plaintiff had no issues with her extremities. Dr. Casey diagnosed allergic rhinitis (allergic inflammation of the nasal airways), internal derangement of knee, and back pain.

On July 28, 2009, plaintiff went to the emergency room with complaints of left knee and lower leg pain (Tr. 438-443). X-rays of plaintiff's knees were normal. A doctor diagnosed left knee contusion and strain and advised plaintiff to take Anaprox (non-steroidal anti-inflammatory) and follow up with Dr. Casey.

On August 19, 2009, Dr. Zuehlke completed a medical source statement (MSS) form at the request of plaintiff's counsel (Tr. at 352-353). Dr. Zuehlke checked boxes to indicate that plaintiff could lift and carry less than five pounds frequently and occasionally; stand and/or walk less than 15 minutes continuously and less than one hour total in an eight-hour day; sit for one hour continuously and one hour total in an eight-hour day; and was limited in pushing and/or pulling. She could occasionally balance, finger, feel, see, speak, and hear; but never climb, stoop, kneel, crouch, crawl, reach, and handle. She should avoid any exposure to extreme cold, extreme heat, dust, fumes, and heights; and should avoid moderate exposure to weather, wetness and humidity, vibration, and hazards. She would need to lie down frequently, and her medications would cause limitations.

23

On October 12, 2009, plaintiff saw Dr. Casey complaining of cough and requesting medication refills (Tr. at 356). Dr. Casey noted that plaintiff was getting reasonable relief from pain and was "better able to function" and engage in activities. He diagnosed acute bronchitis, chronic obstructive pulmonary disease ("COPD") exacerbation, insomnia, and back pain; and he refilled plaintiff's medications.

On October 2, October 19, and December 26, 2009, plaintiff went to the emergency room for issues unrelated to her allegedly disabling impairments, where she was treated with antibiotic ointments, cough medicine, and pain medication (Tr. at 423-433, 436-437).

On January 15, 2010, plaintiff saw Dr. Casey for a follow up on a fall from December (Tr. at 506-507). Plaintiff continued to smoke. She requested a refill of Norco (narcotic). She had had a productive cough for three days. Her exam was normal. "Long discussion of noncompliance and diabetes and lack of money." She was assessed with acute bronchitis, chronic pain, and noncompliant uncontrolled diabetes.

On February 2, 2010, plaintiff returned to the emergency room, complaining of sudden onset of left back pain in her kidney area (Tr. at 416-421). Plaintiff reported that she had not been taking Actos (for diabetes) or Plavix (prevents blood clots) regularly because of the cost. She continued to smoke a pack of cigarettes per day. She reported several weeks of shortness of breath when she lies down for a while. X-rays of plaintiff's heart and lungs were normal. Barbara Yates, D.O., diagnosed acute low back pain, tobacco abuse, mild "CHF,[11]" noncompliant hypertension, urinary infections, and noncompliant insulin-dependent diabetes mellitus (Tr. at 419). She prescribed medications, including Norco (narcotic), Albuterol (to

---

[11]Congestive heart failure. As the heart's pumping becomes less effective, blood may back up in other areas of the body. Fluid may build up in the lungs, liver, gastrointestinal tract, and the arms and legs (edema). This is called congestive heart failure.

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 24 of 44

assist with breathing), Atrovent (treats bronchitis, emphysema and chronic obstructive pulmonary disease), Lopressor (treats hypertension), and Bactrim (antibiotic for urinary infection), and she wrote, "You must stop smoking. You must take your meds."

On February 4, 2010, plaintiff saw Dr. Casey for a follow up on her ER visit (Tr. at 502-506). Dr. Casey noted no significant indication of edema (swelling caused by an abnormal accumulation of fluid, usually in the feet, ankles and legs). He assessed acute kidney infection and backache.

On March 16, 2010, Dr. Casey prepared a Medical Source Statement at the request of plaintiff's counsel (Tr. at 498-500). Dr. Casey marked boxes on a form to indicate that plaintiff could lift or carry five pounds occasionally and frequently; stand or walk for 15 minutes continuously and up to two hours total in an eight-hour workday; sit for 15 minutes continuously and up to two hours total in an eight-hour workday; and engage in limited pushing and pulling. She could frequently reach, handle, finger, feel, see, speak, and hear; and occasionally climb, balance, stoop, kneel, crouch, and crawl. She should avoid moderate exposure to extreme cold and heat, weather, wetness and humidity, dust and fumes, vibration, hazards, and heights. She should lie down or recline for 20 minutes every two hours, and she would show decreased concentration, persistence, or pace or other limitations due to use of narcotics.

Plaintiff submitted the following additional evidence to the Appeals Council only (Tr. at 4-5, 514, 518).

On January 13, 2011, Dr. Casey wrote a three-line letter to plaintiff's counsel stating that he had seen plaintiff that day and "She is no longer able to work" (Tr. at 519). The letter did not include any additional explanatory or diagnostic information, nor was it accompanied by contemporaneous treatment notes.

On March 21, 2011, Dr. Casey completed another Medical Source Statement form at the request of plaintiff's counsel (Tr. at 514-516). Dr. Casey marked boxes to indicate that plaintiff could lift or carry 15 pounds occasionally and 10 pounds frequently; stand or walk for 30 minutes continuously and up to two hours total in a workday; sit for up to one hour at a time and up to three hours total in a workday; and was limited in her ability to push and pull due to back pain. She could frequently handle, finger, feel, see, speak and hear; "occasionally to frequently" reach; and occasionally climb, balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold and heat, weather, wetness and humidity, dust and fumes, vibration, hazards, and heights. She should lie down or recline for 20 minutes every two hours. Narcotic medication caused a decrease in her concentration, persistence, or pace, or other limitations.

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Edmund Werre entered his opinion on July 26, 2010 (Tr. at 10-19). He found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2011 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12). She works two and a half hours per day, five days per week earning $8 per hour as a home health aide, but these earnings do not amount to substantial gainful activity (Tr. at 12).

Step two. Plaintiff suffers from the following severe impairments: Type II diabetes mellitus, coronary artery disease status post stenting, asthma, obesity and right kidney disease (Tr. at 12). Plaintiff's mental impairment is not severe (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four.  Plaintiff's subjective complaints of disabling symptoms are not entirely credible (Tr. at 15).  She retains the residual functional capacity to perform light work except that she can lift and carry up to ten pounds; stand and/or walk for two hours per day; sit six hours per day; must be able to alternate sitting and standing every 30 minutes; should have no exposure to humidity, temperature extremes or irritants such as gases, fumes or chemicals; and should do no climbing of ladders, ropes or scaffolds (Tr. at 14).  With this residual functional capacity, plaintiff cannot perform her past relevant work as a nurse assistant (Tr. at 18).

Step five.  Plaintiff can perform other work which exists in significant numbers, such as order clerk food/beverage or polisher[12] (Tr. at 19).  Therefore, plaintiff is not disabled (Tr. at 19).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d

---

[12]The ALJ actually found that plaintiff could perform the jobs of marker and assembler of electrical accessories in addition to the jobs of order clerk food/beverage and polisher, based on the vocational expert's testimony (Tr. at 19).  However, the hypothetical to which the vocational expert included those four occupations involved standing and/or walking for six hours per day, not two.  When the ALJ gave the vocational expert another hypothetical further limiting the walking and standing, he testified that such a person could perform the last two sedentary jobs, not that the person could still perform all four jobs (Tr. at 45-46).

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 27 of 44

836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Plaintiff argues that the ALJ failed to evaluate the duration, frequency and intensity of plaintiff's pain, and that in regard to her activities of daily living, plaintiff testified that her mother takes care of things for her because she is in too much pain to do so.

Plaintiff testified that she was unable to work due to back problems, heart problems, and asthma. In her disability report, she represented that she was disabled due to diabetes and digestion problems as well. Despite her allegations of disability due to diabetes, evidence of record showed that plaintiff's diabetes was uncomplicated, stable, and well-controlled when

28

she was compliant with medication. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)). Although plaintiff occasionally said she was not able to afford medications, she was on Medicaid and there is no evidence that she ever requested samples or low-cost alternatives or sought out care available to indigent patients. Plaintiff continued to smoke, and apparently pay for, one-half to four packs of cigarettes a day, in spite of her claimed inability to afford medication and repeated medical advice to stop smoking. See Riggins v. Apfel, 177 F.3d 689 (8th Cir. 1999) (claimant claims he could not afford medication, but there is no evidence to suggest that he sought any treatment offered to indigents or chose to forego smoking cigarettes a day to help finance medication). Furthermore, plaintiff's smoking clearly exacerbated her asthma, heart problems and diabetes, but she continued to smoke and forego her medications. Failure to follow prescribed treatment may be grounds for denying an application for disability benefits. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008).

Plaintiff also claimed disability due to heart problems. Although plaintiff reported occasional chest pain, relieved somewhat by aspirin, medical records showed that post-stent, she was stable with medications. A cardiologist repeatedly noted that post-stent plaintiff's heart was fine; he thought her pain was not cardiac in nature and would go away without treatment. Post-stent EKGs and catheterizations were normal.

Plaintiff claimed she had asthma and difficulty walking and breathing. Treatment records show some issues with wheezing and upper airway coarseness; however, chest x-rays and examinations generally revealed that plaintiff's lungs were clear. Most of plaintiff's treatment for respiratory issues was for cough due to acute illnesses such as bronchitis and rhinitis, not because of asthma or any disabling breathing impairment. Plaintiff did not get any

29

regular breathing treatments for asthma, but she claimed to use a rescue inhaler when she "could afford it." The ALJ noted that despite plaintiff's claims of breathing issues, she continued to smoke, and she disregarded her physician's repeated warnings to stop smoking.

In assessing plaintiff's credibility, the ALJ noted that plaintiff participated in a wide range of activities. She worked as a home health aide, cared for children, paid bills, used a checkbook, did laundry and dishes, prepared meals, watched television, read the newspaper, and drove to the store or to visit her mother every day. Activities of daily living are a valid factor for the ALJ to consider in assessing credibility. See 20 C.F.R. §§ 404.1529(c)(3)(I) and 416.929(c)(3)(I). Plaintiff's ability to engage in such daily activities suggests that her impairments were not as severe as she alleged and provides evidence that "further confirms" her ability to work on a daily basis. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000). Although she argues that her mother came to her home up to four times a week to clean plaintiff's house and cook for her, plaintiff was actually being paid to do those very things for her brother at the time she claims she was in too much pain to do those things for herself.

Plaintiff claimed she was unable to work as of December 31, 2006, but the record shows that she not only worked as a home health aide long before her alleged onset of disability, she continued to do so well after her alleged onset date. According to plaintiff's testimony, she did dishes and cooked for her brother -- the very activities she claimed she was unable to do and had to rely on her elderly mother for help. There is no credible evidence to show that plaintiff's impairments became significantly worse at or around the time of time of her alleged onset of disability. In fact, plaintiff's earnings record suggests that plaintiff's lack of substantial gainful earnings is not due to disability since she actually reached the SGA level during only one year of her life (1989) prior to her being paid by Medicaid for taking care of relatives shortly before her alleged onset date. During the two years AFTER her alleged onset

30

date (2007 and 2008) she earned more money than in any year of her life with the exception of 1989 and the few years she was being paid by Medicaid for performing family assistance.

Despite her allegations of disability, plaintiff continued to work, at least through the date of the hearing, which calls into question the sincerity of her belief that her impairments precluded all work. Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("Thus, despite suffering from what she calls 'extreme fatigue,' Van Vickle continued working for over four years."). Work performed on a part-time basis or with considerable difficulty in spite of limitations still demonstrates an ability to perform substantial gainful activity. Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992).

Plaintiff claimed she suffered too much pain from headaches to do anything other than lie down at home, but even on days when she had those headaches she went to work at her brother's because she "had to." In fact, plaintiff claims she is unable to sit for very long, but could sit for a long drive to the hearing because she was running late. Plaintiff's being able to perform various functions when she is working at a part-time job or running out of time suggests that her "inability" to do those same things when she is not facing those pressures is not due to being disabled. She testified that she does "no lifting" at her job; however, it is impossible to cook and do dishes without doing at least some lifting. Plaintiff testified she had been working taking care of her brother for 40 years, but she was only 46 years of age when she so testified. She testified that she cut down her hours about six years earlier; however, her earnings record shows that she earned the highest amount of her entire life during the year she alleges she became disabled.

Plaintiff testified she started using insulin about one month before the April 2010 hearing; however, the medical records show that she was supposed to be taking insulin as early as March 2007. Plaintiff was asked whether her doctor had recommended a special diet

31

to help control her diabetes and plaintiff gave a non-responsive answer. When asked a second time whether her doctor had ever recommended she follow a special diet for diabetes, plaintiff said, "No." However, the record is replete with recommendations from treating doctors to diet and get regular exercise.

Plaintiff testified that a "back specialist" told her that her back problem was caused by the nerves and that is why injections did not work; however, there are no medical records in the file from a back specialist, nor do any of Dr. Casey's records refer to plaintiff having gone to a back specialist. His records do not even mention a recommendation that plaintiff see a back specialist. Nor is there any explanation as to why surgery has not been mentioned or considered if plaintiff's back pain is so severe as to be disabling. Plaintiff testified that she takes narcotics and lies down, up to five or six hours per day, due to back pain. However, the only treatment records which mention lying down are dated two months before the administrative hearing -- plaintiff went to the emergency room and said that she would feel short of breath after lying down for a while. No doctor recommended that plaintiff lie down to relieve back pain, and she never reported to any doctor that she was using this type of activity to alleviate back pain. In fact, each time plaintiff was told to exercise regularly, she remained silent about the need to lie down most of her day due to disabling back pain.

Credibility questions concerning a claimant's subjective testimony are "primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When the ALJ articulates inconsistencies that undermine the claimant's subjective complaints, and when those inconsistencies are supported by the record, the ALJ's credibility determination should not be disturbed. Eichelberger v. Barnhart, 390 F.3d at 590 ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."). Here, the ALJ

outlined good reasons for discounting the credibility of plaintiff's subjective allegations, and the substantial evidence in the record overwhelmingly supports that finding.

## VII.    OPINION OF PLAINTIFF'S TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in discounting the opinion of Dr. Casey in his Medical Source Statement and in failing to specify whether any weight was given to the opinion of Dr. Zuehlke in his Medical Source Statement.

The opinion of a treating physician controls if it is well supported and is not inconsistent with the other substantial evidence; however, a treating physician's opinion does not automatically control, since the record must be evaluated as a whole. Renstrom v. Astrue, 60 F.3d 1057, 1064 (8th Cir. 2012). An ALJ may discount or even disregard the opinion of a treating physician when other medical assessments are supported by better or more thorough medical evidence, or when a treating physician renders inconsistent opinions that undermine the credibility of such opinions. Id.; Perkins v Astrue, 648 F.3d 892, 897 (8th Cir. 2011). An ALJ may "properly discount[] a doctor's report, in part, because it 'cited only limitations based on [the claimant's] subjective complaints, not his own objective findings.'" Teague v. Astrue, 638 F.3d 611, 616 (8th Cir. 2011). If an ALJ discounts a treating physician's opinion, he must give "good reasons" for doing so. Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011). An ALJ may justifiably discount a treating physician's opinion when that opinion "is inconsistent with the physician's clinical treatment notes." Id.; Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009).

The opinions at issue are as follows:

August 19, 2009, Dr. Zuehlke's Medical Source Statement.

- Lift and carry less than five pounds frequently and occasionally.

33

- Stand and/or walk less than 15 minutes continuously and less than one hour total in an eight-hour day.

- Sit for one hour continuously and one hour total in an eight-hour day.

- Limited in pushing and/or pulling. The form says, "please describe" however, Dr. Zuehlke left that blank.

- Occasionally: balance, finger, feel, see, speak, and hear.

- Never: climb, stoop, kneel, crouch, crawl, reach, and handle.

- Avoid any exposure to: extreme cold, extreme heat, dust, fumes, and heights.

- Avoid moderate exposure to: weather, wetness and humidity, vibration, and hazards.

- She needs to lie down frequently.

- Her medications cause limitations. The form says, "please describe" however, Dr. Zuehlke left that blank.

March 16, 2010, Dr. Casey's Medical Source Statement.

- Lift or carry five pounds occasionally and frequently.

- Stand and/or walk for 15 minutes continuously up to two hours total in an eight-hour day.

- Sit for 15 minutes continuously and up to two hours total in an eight-hour day.

- Limited in pushing and pulling. The form says, "please describe" however, Dr. Casey left that blank.

- Frequently: reach, handle, finger, feel, see, speak, and hear.

- Occasionally: climb, balance, stoop, kneel, crouch, and crawl.

- Avoid moderate exposure to: extreme cold and heat, weather, wetness and humidity, dust and fumes, vibration, hazards, and heights.

- She needs to lie down or recline for 20 minutes every two hours.

- Her medications cause limitations. The form says, "please describe" and Dr. Casey wrote, "narcotics".

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 34 of 44

<u>March 21, 2011, Dr. Casey's Medical Source Statement.</u>

- Lift or carry 15 pounds occasionally and 10 pounds frequently.

- Stand and/or walk for 30 minutes continuously and up to two hours total in an eight-hour day.

- Sit for up to one hour at a time and up to three hours total in an eight-hour day.

- Limited in pushing and pulling. The form says, "please describe" and Dr. Casey wrote, "back pain."

- Frequently: handle, finger, feel, see, speak and hear.

- Occasionally to frequently: reach.

- Occasionally: climb, balance, stoop, kneel, crouch, and crawl.

- Avoid concentrated exposure to: extreme cold and heat, weather, wetness and humidity, dust and fumes, vibration, hazards, and heights.

- She needs to lie down or recline for 20 minutes every two hours.

- Her medications cause limitations. The form says, "please describe" and Dr. Casey wrote, "narcotics".

These forms, without considering the underlying medical records, actually indicate that plaintiff's ability to lift continuously improved: In 2009, she could lift less than five pounds, in 2010 she could lift five pounds, and by 2011 she could lift 15 pounds occasionally and 10 pounds frequently.

Likewise, her ability to stand and/or walk improved with time: In 2009 she could stand and/or walk less than 15 minutes at a time and for less than one hour per day. In 2010 she could stand and/or walk for 15 minutes at a time and up to two hours per day. And by 2011, she was able to stand and/or walk for 30 minutes at a time and up to two hours per day.

Her ability to sit also got progressively better: In 2009 she could sit for one hour total all day. In 2010 she could sit for two hours total per day. And by 2011 she could sit for three hours total per day.

35

The ALJ found that plaintiff could lift up to ten pounds -- this is less than what Dr. Casey found in 2011. The ALJ found that plaintiff could stand and/or walk for up to two hours. This is the same thing Dr. Casey found in 2011. The ALJ found that plaintiff could sit for six hours per day. Although plaintiff's treating doctors found that her ability to sit improved by an hour each year, the final finding in 2011 was that plaintiff could sit for up to three hours per day. However, there is no evidence in any of the medical records to support this. Plaintiff never complained to any treating doctor, hospital physician, nurse, or physician's assistant that sitting caused her any difficulties. No medical professional ever recommended that plaintiff limit her sitting. Her back problems were treating with nothing but medication -- the same medication routinely. She did not participate in physical therapy, no doctor ever recommended she try a TENS unit or other non-medicinal pain treatments, there is no record of her ever having been to a chiropractor or having received steroid injections. Those actual treatment records are not present; none of the medical records in the file mention the fact that plaintiff had already tried those types of treatments. No surgery was suggested. No specialist was suggested. This continuous and unchanging treatment suggests that plaintiff's treating physician believed that her symptoms were being adequately controlled by her medication.

As far as the need to lie down, plaintiff testified in April 2010 that her doctor recommended she lie down "about a month before the hearing." However, Dr. Zuehlke's Medical Source Statement indicates plaintiff needs to lie down frequently, and that document is dated August 2009. Not only did he never mention lying down in any of his own medical records, plaintiff was apparently unaware that she was supposed to be lying down "frequently" per her cardiologist for almost a year before the hearing. Neither do Dr. Casey's medical records ever recommend that plaintiff lie down at all much less for 20 minutes every two hours. In fact, the record shows the opposite. Plaintiff was told by Ms. Heuser, a

physician's assistant; Dr. Casey; and Dr. Li to get regular exercise. She was told this repeatedly and for years, beginning in December 2006, the month of her alleged of disability, and continuing for years after that.

Finally, the Medical Source Statements indicate that plaintiff's pain medication causes drowsiness and other limitations; however, no medical record indicates that plaintiff ever complained of side effects from her pain medication.

Dr. Casey's and Dr. Zuehlke's opinions consisted of little more than check-the-box forms. The Eighth Circuit has noted that such an opinion has limited evidentiary value. See Wildman v. Astrue, 596 F.3d at 964 (the ALJ properly discounted a physician's opinion because it was conclusory, consisted of three checklist forms, cited no medical evidence, and provided little to no elaboration). Neither doctor, in these forms, offered any specific findings or diagnostic evidence to support his general statements. A treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. See 20 C.F.R. §§ 404.1527(d) and 416.927(d). As the ALJ noted, Dr. Casey's Medical Source Statement was unsupported, inconsistent with his treatment notes, and inconsistent with other evidence of record; accordingly, it was entitled to "little weight" and the ALJ did not err in affording it no more.

Although the ALJ did not explicitly assign the specific weight he gave to Dr. Zuehlke's opinion, the ALJ makes clear that he found the opinion to be "inconsistent with the medical evidence of record" and declined to include those limitations in his residual functional capacity assessment. Dr. Zuehlke's opinion, like Dr. Casey's, was submitted on a check-the-box form with no documentary medical evidence or explanatory comments. It was submitted more than eight months after the doctor last saw plaintiff. And as discussed above, it differed markedly from Dr. Zuehlke's treatment notes. In contrast to the significant limitations set forth in the

Medical Source Statement, Dr. Zuehlke repeatedly found that plaintiff had normal ECG and EKG results and post-stent angiograms were completely normal. Even though plaintiff complained of occasional chest pain, Dr. Zuehlke thought it was "unlikely" that the pain was heart-related. The ALJ specifically noted that Dr. Zuehlke's treatment records showed that plaintiff had only "atypical chest pain," and Dr. Zuehlke never restricted plaintiff's activities in any way. Dr. Zuehlke's treatment records contain neither complaints nor recommendations commensurate with the limitations found in the Medical Source Statement prepared for plaintiff's disability case.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to discredit the opinions of plaintiff's treating physicians in the Medical Source Statements.

## VIII. LOW BACK PAIN

Next plaintiff argues that the ALJ erred in finding that plaintiff's low back pain is not a severe impairment. The ALJ specifically mentioned plaintiff's back pain:

> The claimant testified that she has difficulties with sitting, standing, driving, walking and bending; however, treatment records indicate a diagnosis of only chronic back pain. Lumbar range of motion was decreased. Lumbar spasm was present but neurologically she was intact. Back pain was resolved with medications. Treatment records show no recent x-rays or MRIs of the back.

(Tr. at 17).

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)     Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

(1)     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)     Capacities for seeing, hearing, and speaking;

(3)     Understanding, carrying out, and remembering simple instructions;

(4)     Use of judgment;

(5)     Responding appropriately to supervision, co-workers and usual work situations; and

(6)     Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe.  Caviness v. Massanari, 250 F.3d 603, 604-605 (8th Cir. 2001).  While severity is not an onerous requirement, it is not a "toothless standard," and claimants must show more than minimal interference with basic work activities.  Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007).  To be considered severe, the impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

Despite plaintiff's argument, "pain" is neither an impairment nor a limitation.  Pain is a symptom that can cause exertional limitations, nonexertional limitations, or a combination of both.  20 C.F.R. §§ 404.1569a(a) and 416.969a(a) ("Your impairment(s) and related symptoms, such as pain, may cause limitations of function or restrictions which limit your

ability to meet certain demands of jobs."). Contrary to plaintiff's assertion, pain, by itself, cannot constitute a medically determinable impairment. See 20 C.F.R. §§ 404.1569a(a) and 416.969a(a); Social Security Ruling (SSR) 96-4p; SSR 96-8p.

Plaintiff has not demonstrated that she has a severe underlying back impairment. Although Dr. Casey noted degenerative disc disease based on plaintiff's self-reported medical history, subsequent x-rays of plaintiff's spine taken in April 2009 did not confirm a severe back impairment. Rather, they showed some degenerative changes, but were otherwise normal, with no fractures and well-maintained vertebral bodies and interspaces. Doctors repeatedly noted no weakness, no issues with coordination, no problems with plaintiff's gait or ability to ambulate. There is no evidence in the record to show that plaintiff ever saw a back specialist or received specialized treatment for her back during the relevant period. Although plaintiff took pain medication during her alleged period of disability, Dr. Casey noted that plaintiff was "doing well" and was "able to function" on her medications.

In any event, regardless of whether the ALJ found a severe back impairment, the real issue is whether plaintiff's limitations significantly limit her ability to perform a full range of work at the appropriate exertional level. Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005). In this case, by limiting plaintiff to light work, with lifting and carrying no more than ten pounds, standing or walking no more than two hours total in an eight-hour day, and frequent position changes, the ALJ accounted for any limitations resulting from plaintiff's alleged back pain.

## IX.   *RESIDUAL FUNCTIONAL CAPACITY*

Finally, plaintiff argues that the ALJ erred in improperly formulating a residual functional capacity.

An ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all of the relevant evidence. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995)). Evidence relevant to a residual functional capacity determination includes medical records, observations of treating physicians and others, and an individual's own description of his limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d at 779). After considering all of the evidence of record, including the extensive medical records and plaintiff's subjective testimony, the ALJ found that plaintiff could lift and carry ten pounds, stand and/or walk two hours in an eight-hour day, sit six hours in an eight-hour day with changing positions every 30 minutes, and she must avoid exposure to humidity, temperature extremes, or irritants such as gases, fumes, or chemicals, and not climb ladders, ropes or scaffolds.

Plaintiff states that the residual functional capacity assessment is not "in proper form" because it is not identical to the definition of light work set forth in the regulations. The regulations, at 20 C.F.R. §§ 404.1567(b) and 416.967(b), define light work as lifting 20 pounds occasionally and 10 pounds frequently, whereas the ALJ limited plaintiff to lifting 10 pounds. However, the residual functional capacity assessment is for light work generally, with additional restrictions. This is consistent with the regulations and guidance in SSR 96-8p, which provide that a residual functional capacity is the most that an individual can do despite his limitations. See 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1); SSR 96-8p. In fact, SSR 96-8p states that a residual functional capacity assessment must not be expressed in terms of the lowest exertional level, e.g. sedentary, when the claimant can perform light work.

Plaintiff next argues that the residual functional capacity assessment was defective because it was not set forth in a "function by function manner," as required by SSR 96-8p.

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 41 of 44

Plaintiff states that the ALJ erred by failing to assess limitations in her ability to balance, stoop, kneel, crouch, or crawl. However, the ALJ is not required to list every function, including functions for which he found no limitations. McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011) ("we do not require an ALJ to mechanically list and reject every possible limitation"). Where all of the functions that the ALJ specifically addressed in the residual functional capacity assessment were those for which he found a limitation, a court can reasonably believe that those functions he omitted were those that were not limited. Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003).

Plaintiff next argues that the ALJ erred by failing to include a "narrative bridge" linking the medical evidence of record to the limitations set forth in the residual functional capacity assessment. However, the ALJ is not required to provide each limitation in the residual functional capacity assessment immediately followed by a list of the specific evidence supporting this limitation. See SSR 96-8p. Such would not only be anathema to a finding based on "all of the relevant evidence," but would result in overly lengthy decisions containing duplicative discussions of the same evidence in multiple sections. McKinney v. Apfel, 228 F.3d at 863. Such a requirement for duplicative and exacting discussion of every piece of evidence would only add further delay to the current backlog of cases awaiting decision by an ALJ, a backlog growing by the day. As the Supreme Court has stated, "[t]he disability programs administered under Titles II and XVI are of a size and extent difficult to comprehend," Heckler v. Day, 467 U.S. 104, 106 (1984) and "[t]he need for efficiency is self-evident." Barnhart v. Thomas, 540 U.S. 20, 28-29 (2003) (internal quotations omitted).

Plaintiff also argues that the ALJ failed to cite any evidence to support his "arbitrary conclusion" that plaintiff's ability to lift and carry was reduced due to her obesity, and did not provide a basis for other limitations in the residual functional capacity assessment. However,

Case 6:11-cv-03356-REL   Document 13   Filed 01/14/13   Page 42 of 44

in restricting the amounts plaintiff could lift and carry, the ALJ gave plaintiff the benefit of the doubt. He found that obesity, "in combination with [plaintiff's] other impairments, somewhat reduce[s her] ability to lift and carry." In other words, the ALJ properly based the lifting and carrying limitations on evidence regarding all of plaintiff's limitations, not just her obesity.

Plaintiff asserts that the ALJ failed to "specifically show that he evaluated all of the evidence." However, the ALJ specifically stated that he had carefully considered all of the evidence before making his determination. The ALJ's decision specifically references plaintiff's testimony, vocational expert testimony, and the voluminous medical records, reflecting a careful review of the record. Contrary to plaintiff's assertion, the ALJ need not mention each separate piece of evidence in the record. The fact that an ALJ did not describe the entirety of a claimant's medical history does not mean that he disregarded certain aspects of the record. Wheeler v. Apfel, 224 F.3d 891, 896, n. 3 (8th Cir. 2000).

Finally, plaintiff argues that the residual functional capacity assessment was deficient because it did not account for all of her impairments. Specifically, plaintiff asserts that it is "difficult to ascertain" how the ALJ accounted for plaintiff's back pain in the residual functional capacity assessment. As discussed above, the record did not support a finding of a severe back impairment. The ALJ gave plaintiff the benefit of the doubt by limiting her to lifting and/or carrying no more than ten pounds and standing or walking no more than two hours in an eight-hour day with the opportunity to alternate positions every 30 minutes.

"It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d at 779). In this case, plaintiff has not identified what, if any, additional limitations should have been included in the residual functional capacity assessment, nor has she demonstrated that her impairments warranted inclusion of any

43

additional limitations.  In her disability report, plaintiff stated that because of her impairments, it was "[s]ometimes hard to walk" and "[s]ometimes hard to breathe;" she did not report any other limitations.  The ALJ limited plaintiff to no more than two hours of standing and walking per day; and because of her alleged breathing issues, he precluded her from exposure to humidity, temperature extremes, gases, fumes, and chemicals.  No further limitations are warranted by the evidence.

Based on the above, I find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment.

X.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 14, 2013

44